# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PATIENTPOINT ROYALTY HOLDINGS, INC,**

      **Plaintiff,**

**v.**                                          Case No:   6:17-cv-1051-Orl-31DCI

**HEALTHGRID COORDINATED CARE SOLUTIONS, INC and HEALTHGRID HOLDING COMPANY,**

      **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the Motion to Dismiss or, in the Alternative, to Compel Arbitration (Doc. 25) filed by the Defendants, the response in opposition (Doc. 30) filed by the Plaintiff, PatientPoint Royalty Holdings, Inc. (henceforth, "PPRH"), and the reply (Doc. 35) filed by the Defendants.

### I. Background

According to the allegations of the Amended Complaint (Doc. 22), PPRH is the successor in interest[1] to PatientPoint, LLC ("PatientPoint"), which in June 2015 sold all of the stock of PatientPoint Coordinated Care Solutions, Inc. ("PPCCS") to Defendant HealthGrid Coordinated Care Solutions, Inc. ("HealthGrid") for 20,000 shares of HealthGrid stock. (Doc. 22 at 2). The deal also included a royalty agreement (the "Agreement") under which PatientPoint was to receive

---

[1] Though they have not put the point in issue in their motion, the Defendants suggest that PPRH may not be a proper successor in interest to PatientPoint. (Doc. 25 at 3 n. 2). Without deciding the issue, this order will refer to PPRH as the successor to PatientPoint.

a share of HealthGrid's future "Revenue" – a term defined in the Agreement. (Doc. 22 at 14). PatientPoint assigned its rights under the Agreement to another entity, which immediately transferred those rights to PPRH. (Doc. 22 at 2-3).

A dispute has arisen between these parties regarding the definition of Revenue and, by extension, the amount of royalties to which PPRH is entitled. By way of the instant suit, PPRH seeks a declaration that its interpretation of that definition is correct. The Defendants contend that PPRH's request for declaratory relief does not present an actual case or controversy, and therefore this Court lacks subject matter jurisdiction. In the alternative, the Defendants argue that this matter must be referred to arbitration.

**II. Legal Standard**

**A. Subject Matter Jurisdiction and Declaratory Judgments**

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The Declaratory Judgment Act does not confer subject matter jurisdiction on the court; any request for such a judgment must still satisfy Article III of the Constitution, which limits the judicial power to "cases" and "controversies." To do so, the underlying dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, (1937). It must also be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241.

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of

>degree, and it would be difficult, if it would be possible, to fashion a
>precise test for determining in every case whether there is such a
>controversy. Basically, the question in each case is whether the facts
>alleged, under all the circumstances, show that there is a substantial
>controversy, between parties having adverse legal interests, of
>sufficient immediacy and reality to warrant the issuance of a
>declaratory judgment.

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941).

>Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1)
>come in two forms. "Facial attacks" on the complaint "require[ ] the
>court merely to look and see if [the] plaintiff has sufficiently alleged
>a basis of subject matter jurisdiction, and the allegations in his
>complaint are taken as true for the purposes of the motion."
>*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.),
>cert. denied, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980)
>(citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884,
>891 (3d Cir.1977)).  "Factual attacks," on the other hand, challenge
>"the existence of subject matter jurisdiction in fact, irrespective of
>the pleadings, and matters outside the pleadings, such as testimony
>and affidavits, are considered." *Id.*

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

### B. Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA was designed to overrule "the judiciary's long-standing refusal to enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-20 (1985). It reflects "an emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLC v. Cocchi,* 565 U.S 111, 111 (2011) (*per curiam*).

The FAA does not require parties to arbitrate when they have not agreed to do so or prevent parties who do agree to arbitrate from excluding certain claims for the scope of their

arbitration agreement; it simply requires courts to enforce privately negotiated agreements to arbitrate, in accordance with their terms. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). To determine whether an agreement to arbitrate governs a particular dispute, the court interprets the agreement as it would any other contract. *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004). But, unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

### III. Analysis

The Agreement was executed on June 10, 2015 by HealthGrid, Mahathi Software Private Limited ("Mahathi"), and PatientPoint (which, as noted, subsequently assigned its rights to PPRH). (Doc. 22 at 12). The Agreement, which provides that it is to be governed by Delaware law (Doc. 22 at 25), defines "Revenue" as

> the gross revenue, as defined by U.S. GAAP, recognized by [HealthGrid], or otherwise generated by or related to the business of [HealthGrid], with respect to (i) ambulatory care coordination, (ii) ambulatory population health management, (iii) electronic check-in, and (iv) ambulatory screenings. Notwithstanding the foregoing, all gross revenue recognized by [HealthGrid], beginning on the date hereof and continuing until the end of the Royalty Term, with respect to the products and services offered by [HealthGrid] as of the date hereof, shall be included in the calculation of Revenue.

(Doc. 22 at 14). Under the terms of the Agreement, PPRH is to receive quarterly royalty payments of 7 percent of HealthGrid's Revenue for a 15-year period, referred to as the "Royalty Term"; the Royalty Term is to begin the month after HealthGrid achieves $5 million in aggregate Revenue. (Doc. 22 at 14).

The Agreement requires that HealthGrid provide PPRH with quarterly statements setting forth its good-faith estimate of (1) the Revenue earned that quarter and (2) the royalty payment, if

- 4 -

any, for that quarter. (Doc. 22 at 15). Along with the quarterly statements, HealthGrid is required to immediately transfer the amount of the estimated royalty payment to PPRH. (Doc. 22 at 15). HealthGrid is also required to provide an audited annual financial statement and a final royalty statement within 90 days of the end of each calendar year. (Doc. 22 at 15).

In addition to the royalty provisions, the Agreement contained a number of operating covenants, including one that provides that HealthGrid, Mahathi and "their respective Affiliates"[2] shall

> operate the business in the ordinary course, including using their best efforts to maximize the Revenue and … shall not take any action or fail to take any action outside of the ordinary course of business that might have or does have an adverse effect upon the Revenue or business of [HealthGrid].

(Doc. 22 at 19).

On March 30, 2017, PPRH notified HealthGrid by letter (henceforth, the "March 30 Letter") – a copy of which is attached to the Amended Complaint – that the latter was in default of the Agreement based on a failure to provide the required estimated and final royalty statements. (Doc. 22 at 29). More particularly, PPRH suggested that the royalty statements provided by HealthGrid were insufficient, in that they only included sales growing out of the intellectual property acquired due to the PatientPoint sale. Noting the four business areas listed in the definition of Revenue (such as, for example, "ambulatory care coordination"), PPRH asserted that

---

[2] The Agreement defines "Affiliates" as meaning, "with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such first Person." (Doc. 22 at 12). "Person" is defined as "any individual, corporation, limited or general partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof." (Doc. 22 at 13).

HealthGrid's website "described many products and services that fit within this definition," and stated that there was no basis for restricting the scope of the financial data in the statements.

> So that there is no misunderstanding and to be perfectly clear, Revenue is ALL gross revenue, and the financial information is for the entire [HealthGrid] and NOT just those revenues and that financial information based on the "intellectual property" that you acquired from [PatientPoint] in June 2015.

(Doc. 22 at 30).

In an undated response to the March 30 letter, counsel for HealthGrid asserted that the only data that was to be used in the calculation of Revenue was that of HealthGrid, not that of any affiliated companies. (Doc. 22 at 33). Counsel for HealthGrid also asserted that Revenue "was limited to the products and services offered by [HealthGrid] as of" June 10, 2015. (Doc. 22 at 33).

**A. Subject matter jurisdiction**

The Defendants contend that the Amended Complaint does not set forth an actual case or controversy, as required for this court to possess subject matter jurisdiction over this matter. In the words of the Defendants, PPRH has merely alleged "a nascent disagreement regarding how to read a contract." (Doc. 25 at 8). It is true that the allegations set forth in the Amended Complaint are fairly generic. By focusing solely on the Amended Complaint, however, the Defendants have understated the allegations made by PPRH.

When attached to a pleading, exhibits such as the March 30 Letter and the undated response to it become part of the pleading and may be considered for all purposes. *See, e.g., Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 756 (11th Cir. 2010). As detailed above, in the March 30 Letter, PPRH spelled out in much more detail its contention that HealthGrid was undercounting "Revenue" by failing to include income generated by affiliates and for products and services other than those based on the intellectual property it obtained from PatientPoint. (Doc.

22 at 29-30). Similarly, the undated response from HealthGrid, which was also attached to the Amended Complaint, demonstrates that HealtGrid vigorously disagrees with PPRH's contentions that any other such income is to be included when calculating Revenue. (Doc. 22 at 33). Obviously, any undercounting would result in underpayment of royalties due to PPRH, meaning that this dispute is sufficiently concrete to warrant the issuance of a declaratory judgment. The Court finds that it has jurisdiction over this matter.

### B. Arbitration

Section 2.2 of the Agreement, titled "Payment of the Royalty," contains a provision by which PPRH may raise objections to portions of the various financial statements that HealthGrid is required to provide. The Defendants contend that this provision is an agreement to arbitrate, that it covers the issues in dispute here, and therefore this matter must be referred to arbitration.

Section 2.2(c) provides that HealthGrid's quarterly and annual royalty statements and its audited annual financial statement are to become "final and binding" unless PPRH, within 45 days of the delivery of an audited financial statement, notifies HealthGrid of

> (i) its disagreement with any Estimated Royalty Statement or Final Royalty Statement (a **"Notice of Disagreement"**), specifying the nature and amount of any dispute (each, a **"Disputed Item"** or (ii) its desire to conduct an independent audit of the Revenue for the relevant calendar year or certain quarters therein (an **"Audit Request"**).

(Doc. 22 at 15) (capitalization and emphasis in original). If PPRH provides a Notice of Disagreement, the parties have 30 days to try "to resolve in writing any differences they have with respect to the Disputed Items. (Doc. 22 at 16). If any of the Disputed Items have not been resolved within the 30 days, the Agreement provides that

> either Party may submit all unresolved Disputed Items … to one of the "big four" accounting firms mutually agreeable to the Parties and not then representing either of the Parties ("Special

> Accountants") for determination, whose determination shall be
> binding and conclusive on the Parties.

(Doc. 22 at 16).

It is clear that the parties did not intend that all of their disputes be resolved via arbitration. In addition to the plain language of Section 2.2(c), which limits arbitration to so-called Disputed Items, other portions of the Agreement refer to actions to be taken by courts. For example, Section 8 of the Agreement is a non-compete clause. (Doc. 22 at 21). In that section, PPRH agrees that if it were to breach the non-compete clause, HealthGrid would be entitled to "equitable relief, including injunctive relief," as well as "all other remedies available at law." (Doc. 22 at 22). The parties also agree as to what should be done if "a court of competent jurisdiction" determines that the non-compete agreement is unreasonably broad. (Doc. 22 at 22). And the Agreement provides for a waiver of the parties' rights to a jury trial, Doc. 22 at 25, which would be superfluous if the parties believed all disputes would go to arbitration.

The question is therefore whether a dispute over the Agreement's definition of Revenue falls within the boundaries of Section 2.2(c). Upon review, the Court finds that it does not. By its terms, the provisions of Section 2.2(c) are limited to "Disputed Items." Read in context, a Disputed Item is a disagreement as to one of the figures in a quarterly or annual royalty statement. A disagreement as to how Revenue should be calculated would *lead to* a disagreement as to the figures in those statements, but it is not, *itself*, a disagreement over those figures. As such, it is not a Disputed Item.

The conclusion that this matter falls outside the boundaries of the parties' agreement to arbitrate is reinforced by the fact that under Section 2.2(c), an accounting firm must resolve the dispute. When the parties are arguing about the figures in a financial report, an accountant's expertise is clearly useful. When, as here, the parties are arguing about the proper interpretation

of a contractual provision, an accountant's expertise is not likely to be especially helpful. In support of their argument that an accountant would be the proper arbiter of the instant dispute, the Defendants point to the fact that the definition of Revenue includes a reference to "generally accepted accounting principles."[3] But PPRH is arguing that HealthGrid's interpretation of the contract is improper, not that it has violated (or should violate) GAAP.

The Defendants also argue that Delaware law requires arbitration of this dispute. But the cases they cite for this proposition are not determinative. For example, in *Advantage Sales & Marketing LLC v. USG Companies, Inc.*, 2016 WL 2588163 (D. Del. May 4, 2016). the plaintiff had purchased a division of the Defendants' business; in exchange, the Defendants were to receive, *inter alia*, a share of the future "Revenue" generated by the "Business," as those terms were defined by the parties' asset purchase agreement. *Id.* at *1. The asset purchase agreement also contained a dispute resolution mechanism. In the words of the *Advantage Sales* court:

> Specifically, under Section 1.7 of the Agreement, if the Plaintiff and Defendants "are unable to resolve any disagreement with respect to the calculation of Revenue for the Measurement Period," then the disputed amounts "will be referred to the Accounting Firm … for final determination."

*Id.* The parties disagreed as to whether revenues from pre-existing contracts qualified as "Revenue" generated by the "Business"; relying on Delaware law, the *Advantage Sales* court found that Section 1.7 of the Agreement constituted an agreement to arbitrate, that it extended to the dispute over pre-existing contracts, and that it required the dispute to be determined by an accountant. *Id.* at 1-2. The Defendants refer to the *Advantage Sales* opinion as "on point," and note that the fact that contractual provisions were at issue did not preclude the matter being

---

[3] As noted above, the Agreement defines Revenue, in pertinent part, as "the gross revenue, as defined by U.S. GAAP, recognized by [HealthGrid], or otherwise generated by or related to the business of [HealthGrid] …". (Doc. 22 at 14).

referred to an accountant for arbitration. The problem with reliance on *Advantage Sales*, however, is that the arbitration provision in that case was much broader than the agreement here. In *Advantage Sales*, the parties agreed to arbitrate "*any* disagreement with respect to the calculation of Revenue". *Id.* at 1 (emphasis added). Such an agreement would encompass the dispute in this case. But the parties to this case did not agree to arbitrate "any disagreement with respect to the calculation of Revenue." They only agreed to arbitrate those disagreements that fell into the (much narrower) category of "Disputed Items" – i.e.*,* disputes over figures in the royalty statements. As noted above, this is not such a dispute.

### IV. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion to Dismiss or, in the Alternative, to Compel Arbitration (Doc. 25) filed by the Defendants, is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 3, 2017.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party